# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CRAIG W. THOMAS, on Behalf of Himself and All Others Similarly Situated,

Plaintiff,

v.

AMERICAN MIDSTREAM GP, LLC n/k/a THIRD COAST MIDSTREAM HOLDINGS, LLC,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0641-MTZ

## MEMORANDUM OPINION

Date Submitted: September 11, 2024
Date Decided: December 17, 2024

Bruce E. Jameson, Kevin H. Davenport, Samuel L. Closic, Christine N. Chappelear, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Justin S. Brooks, GUTTMAN, BUSCHNER & BROOKS PLLC, Greenville, Delaware, *Attorneys for Plaintiff Craig W. Thomas*.

Michael A. Pittenger, T. Brad Davey, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Stefan Atkinson, Haley Stern, Ariel Geist, KIRKLAND & ELLIS LLP, New York, New York, *Attorneys for Defendant American Midstream GP, LLC n/k/a Third Coast Midstream Holdings, LLC*.

**ZURN, Vice Chancellor.**

This case arises out of a conflicted merger between a master limited partnership and its sponsor. The plaintiff argues the general partner breached its duty to act in good faith in authorizing the merger. A conflicts committee granted special approval of the merger: under the partnership agreement, good faith special approval offers the general partner a rebuttable presumption that it acted in good faith in a conflicted transaction. The plaintiff finds fault with the special approval.

The general partner moved for summary judgment, seeking a conclusive presumption of good faith the partnership agreement offers when the general partner relies on an advisor. The general partner argues the conflicts committee's reliance on an advisor in granting special approval triggered the conclusive presumption for the general partner. The general partner also argues the conflicts committee is itself entitled to that conclusive presumption, resolving the only contested element of special approval.

The general partner is not entitled to a summary judgment. Delaware precedent interpreting similar provisions has held that in the context of a conflicted transaction, the specific provision offering a rebuttable presumption upon special approval controls over the general provision offering a conclusive presumption upon reliance on an advisor. And the conflicts committee's reliance on an advisor did not trigger a conclusive good faith presumption for the general partner because the general partner did not itself rely on that advisor, and the conflicts committee was

1

not acting for the general partner. Finally, the partnership agreement does not afford the conflicts committee a conclusive presumption of good faith based on its reliance on an advisor. This matter is headed for trial.

## I.    BACKGROUND

American Midstream Partners, LP (the "Partnership") was a Delaware master limited partnership ("MLP") that owned a portfolio of midstream energy assets.[1] Defendant American Midstream GP, LLC n/k/a Third Coast Midstream Holdings, LLC ("GP") was the Partnership's general partner.[2]  GP was wholly owned by affiliates of ArcLight Capital Partners, LLC ("Sponsor").[3]

### A.    The Merger

The transaction at issue is a merger between the Partnership and Sponsor in which Sponsor acquired all issued and outstanding Partnership units that Sponsor did not already own (the "Merger").[4] Sponsor proposed the transaction in September 2018.[5]  Because the offer presented a conflict of interest, GP formed a conflicts committee of independent directors (the "Conflicts Committee") to obtain "Special

---

[1] Docket item ("D.I.") 21 [hereinafter "Compl."] ¶ 30.

[2] *Id.* ¶ 12.

[3] *Id.* ¶ 12.

[4] *Id.* ¶ 3.

[5] *Id.* ¶ 5.

Approval," which under the partnership agreement would shield the Merger from judicial review.[6]

GP formed the Conflicts Committee as an independent entity to evaluate the proposed transaction.[7] The Conflicts Committee was charged with negotiating with Sponsor "on behalf of the Partnership."[8] It had no authority to approve the Merger on GP's behalf; it could only "approve *of* the Potential Transaction, including by Special Approval."[9]

From late 2018 to early 2019, the Conflicts Committee negotiated the proposed merger with Sponsor. As part of that process, the Conflicts Committee identified Evercore Group LLC as its desired financial advisor.[10] The Conflicts Committee and Evercore began negotiating an engagement letter in which Evercore would agree to provide a fairness opinion for the Conflicts Committee's use in evaluating the Merger (the "Fairness Opinion").[11] During those negotiations, the

---

[6] *Id.* ¶ 24; D.I. 144 Ex. 1 [hereinafter "LPA"] § 7.9(a).

[7] D.I. 144 Ex. 18 at 5 ("[T]he Conflicts Committee shall exercise independent business judgment in the fulfillment of its duties."); *id.* ("[T]he Conflicts Committee shall not have any duty to consider the interests of [GP] or its controlling affiliates, including [Sponsor]."); *id.* at 1 (meeting minutes noting "the important role of an independent functioning conflicts committee . . . relating to [Sponsor]'s offer"); *see also* D.I. 157 Ex. 28 at 50 (noting that conflicts committees negotiate against the general partner).

[8] D.I. 144 Ex. 18 at 4.

[9] *Id.* (emphasis added).

[10] *See* D.I. 157 Ex. 12.

[11] *Id.*

Conflicts Committee proposed language that would have allowed GP's board of directors (the "Board") to rely on the Fairness Opinion for its own use in evaluating the Merger.[12]  Evercore rejected that language, explaining that "[i]n an MLP conflicts committee situation," the board members not on the conflicts committee "are typically representatives of the general partner who's the party [Evercore is] negotiating against, unlike a normal corporation."[13]  The finalized engagement letter read, in relevant part,

> The Partnership and the Conflicts Committee agree that any information or advice (including, without limitation, an Opinion) rendered by Evercore in connection with this engagement is for the confidential use of the Conflicts Committee only in its evaluation of the Proposed Transaction and in order to provide its special approval of the Proposed Transaction, and may not be provided to or relied upon by any other person without Evercore's prior consent; provided, that, the Opinion and such information may be disclosed on a confidential and non-reliance basis to the [Board] and the senior management of [GP] and to the respective legal advisors of the Conflicts Committee, the [Board] and [GP] who are providing advice with respect to the Proposed Transaction.[14]

In February 2019, the Conflicts Committee and Sponsor agreed to a purchase price of $5.25 per unit.[15]  On March 16, Evercore delivered a 155-slide presentation

---

[12] *Id.* at 1, 7 ("Attached are a few additional comments we would like to make to the engagement letter, the most substantive of which is allowing the Board of Directors to rely on the Opinion.").

[13] *Id.* at 7 (attaching redlined version of the engagement letter rejecting proposed language); D.I. 157 Ex. 28 at 50.

[14] D.I. 157 Ex. 13 at 3.

[15] Compl. ¶ 44.

4

on its Fairness Opinion to the Conflicts Committee.[16] The presentation was prepared for and addressed to the Conflicts Committee.[17] It stated that it "may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with Evercore."[18] After the presentation, the Conflicts Committee granted Special Approval.[19]

Later that day, the Board met to consider the Conflicts Committee's grant of Special Approval.[20] The meeting's purpose was "to receive the report of the Conflicts Committee relating to the Proposed Merger and to discuss and act upon the Conflicts Committee's recommendation."[21] Before the meeting, Board members received materials including a short Evercore deck.[22] The Board deck was prepared for and addressed to the Board, and it limited reliance in the same way as the Conflicts Committee presentation.[23] It contained eleven substantive slides, some of which appeared in the Conflicts Committee deck.[24] The Board deck included

---

[16] D.I. 144 Ex. 7; D.I. 144 Ex. 11 at 2; D.I. 144 Ex. 69.

[17] D.I. 144 Ex. 7 at 380.

[18] *Id.*

[19] D.I. 144 Ex. 11 at 6.

[20] D.I. 144 Ex. 12 at 1.

[21] *Id.*

[22] D.I. 163 Ex. 75 at 915 (attaching "AMID_Board Materials_DRAFT (Evercore_03.16.19).pdf"); *id.* at 918–30.

[23] *Id.* at 919.

[24] *Id.* at 918–30; *see* D.I. 144 Ex. 7.

information on valuation methodologies and value ranges of the Partnership's common units.[25]  It omitted information in the Conflicts Committee deck, like analysis of the Partnership's market situation, discussion of the Partnership's assets, and a review of the Partnership's financial projections.[26]

At the meeting, the Conflicts Committee chair asked the Evercore lead to "provide a summary of the Conflicts Committee's process as it related to valuation of the Partnership's common units."[27]  The Evercore lead "referred the Board to the written materials distributed prior to the meeting" and discussed "value ranges for the Partnership's common units" and "valuation methodologies employed by Evercore in advising the Conflicts Committee and reaching the conclusions expressed in its fairness opinion."[28]  The Evercore lead did not provide the "final fairness opinion presentation" to the Board, and does not believe he attended any presentation of those materials to the full Board.[29]  The minutes reflect that Board members had the opportunity to ask questions, and "[i]t was noted that Evercore did

---

[25] D.I. 163 Ex. 75 at 920–30; *see* D.I. 144 Ex. 12 at 2.

[26] *See* D.I. 163 Ex. 75 at 920–30; D.I. 144 Ex. 7 at 384.

[27] D.I. 144 Ex. 12 at 2.

[28] *Id.*

[29] D.I. 157 Ex. 28 at 22.

6

not consider any tax consequences relating to the Proposed Merger as part of its fairness opinion."[30]

The next portion of the meeting informed the Board about the Conflicts Committee's legal advisor's work.[31] Finally, after the Conflicts Committee formally recommended the Merger, the Board approved it.[32] The Board then discussed a draft press release, and the meeting adjourned.[33]

### B. Relevant LPA Provisions

GP's motion asserts GP is exculpated from the claims in this action because it enjoys a conclusive presumption that it met its standard of conduct under the Partnership's limited partnership agreement (the "LPA"). As is typical for MLPs, LPA Section 7.9(e) eliminates common law fiduciary duties and replaces them with contractual duties.[34] Section 7.9(b) imposes a duty of "good faith" on GP and the Conflicts Committee whenever either "makes a determination or takes or declines

---

[30] D.I. 144 Ex. 12 at 2.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *See* LPA § 7.9(e) ("Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner and the provisions of this Agreement, to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.").

to take any other action . . . unless another express standard is provided for" in the LPA.[35]  In order for a determination to be in good faith, "the Person or Persons making such determination . . . must subjectively believe that the determination . . . is in, or not opposed to, the best interests of the Partnership."[36]

Section 7.9(a) addresses the resolution of conflicts of interest between GP and the Partnership "whenever" such conflicts arise, "[u]nless otherwise expressly provided in" the LPA.[37]  In that context, it provides that any resolution or course of action by GP

> shall not constitute a breach of this [LPA] . . . if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units . . . (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).[38]

The first two enumerated clauses in Section 7.9(a) are safe harbors, which, if properly employed, shield GP's approval of a conflicted transaction from judicial

---

[35] *Id.* § 7.9(b).

[36] *Id.*

[37] *Id.* § 7.9(a).

[38] *Id.*  "Special Approval" is defined as "approval by a majority of the members of the Conflicts Committee." *Id.* § 1.1.  And the Conflicts Committee must comprise one or more members of the Board who meet the LPA's independence criteria. *Id.*

review.[39]  Section 7.9(a) provides that "[i]f Special Approval is sought, then it shall be presumed that, in making its decision, the Conflicts Committee acted in good faith."[40]  A Conflicts Committee's grant of Special Approval therefore presumably satisfies its obligation to act in subjective good faith under Section 7.9(b).  That presumption is rebuttable, and the plaintiff bears the burden of overcoming the presumption.[41]

Section 7.9(a)'s clauses (iii) and (iv) do not operate as safe harbors, but rather as "standards of judicial review of" GP's decision "to approve a conflicted transaction where the conflict-cleansing mechanisms in clauses (i) and (ii) are not utilized" or not properly employed.[42]  As express "standards," they displace Section 7.9(b)'s subjective good faith requirement.[43]  If it is established that Special

---

[39] *Id.* § 7.9(a); *see also Dieckman v. Regency GP LP*, 2021 WL 537325, at *23 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) ("It is logical to refer to the Special Approval and Unitholder Approval clauses in Section 7.9(a) as 'safe harbors' since each entails using a conflict-cleansing mechanism as a condition of approval of a conflicted transaction . . . that, if employed properly, would preclude judicial review of the General Partner's approval of such transaction.").

[40] LPA § 7.9(a).

[41] *Id.* § 7.9(a).

[42] *Dieckman*, 2021 WL 537325, at *24 (interpreting nearly identical provisions to those at issue); *accord* D.I. 55 at 20–21 (Chancellor Bouchard reasoning similarly at the pleading stage of this action).

[43] LPA § 7.9(a) (describing those clauses as "standards"); *id.* § 7.9(b) (explaining the good faith standard applies "unless another express standard is provided for"); *Dieckman*, 2021 WL 537325, at *24 (reasoning that applying Section 7.9(b)'s subjective good faith requirement in those instances "would render meaningless the language in Section 7.9(a)

9

Approval for a conflicted transaction was not properly employed, then GP bears the burden of establishing that the transaction satisfies either of the standards set forth in clauses (iii) or (iv).[44] That is, GP "would have to demonstrate that the transaction either was on terms no less favorable to the partnership than those generally being provided to or available from unrelated third parties, or was fair and reasonable to the partnership, which is akin to an entire fairness standard."[45]

Section 7.9(a) also affords GP a rebuttable presumption of good faith in conflict transactions "if neither Special Approval nor Unitholder approval is sought and [GP] determines that the resolution . . . satisfies either of the standards set forth in clauses (iii) or (iv) above."[46]

On summary judgment, GP looks to Section 7.10(b), which provides a conclusive presumption of good faith to GP when GP relies on advisors it selects. The provision states:

> [GP] may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion (including an Opinion of Counsel) of such Persons as to matters that [GP] reasonably believes to be within such Person's professional or expert competence shall be conclusively

expressly referring to [clauses (iii) and (iv)] as 'standards'—contrary to one of the most basic principles of contract interpretation." (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[44] *Dieckman*, 2021 WL 537325, at *24; D.I. 55 at 20–21.

[45] D.I. 55 at 21.

[46] LPA § 7.9(a).

presumed to have been done or omitted in good faith and in accordance with such advice or opinion.[47]

Finally, Section 7.8(a) exculpates GP from damages absent a court determination that GP acted in bad faith or engaged in fraud or willful misconduct.[48]

### C.    Procedural Background

Plaintiff Craig R. Thomas, a former minority Partnership unitholder, filed this class action against GP in August 2019.[49]  The January 2020 amended complaint pleads four counts in connection with the Merger.[50]  GP moved to dismiss in February 2020, and Chancellor Bouchard dismissed Counts II, III, and IV.[51]  Count I, Thomas's only remaining claim, alleges GP breached the LPA by approving the Merger.[52]  Chancellor Bouchard held it was reasonably conceivable that the Conflicts Committee did not grant Special Approval in good faith as the LPA

---

[47] *Id.* § 7.10.

[48] *Id.* § 7.8(a).

[49] D.I. 1.

[50] Compl. ¶¶ 67–71.

[51] D.I. 48; D.I. 53. Chancellor Bouchard dismissed Thomas's implied covenant claim in Count II "without prejudice to plaintiff's right to reassert the claim if there is a basis to do so after plaintiff takes discovery."  D.I. 55 at 34–35.  On GP's motion for summary judgment, Thomas reasserts the implied covenant as an alternative argument if the Court finds Section 7.10(b) applies either to GP's approval or the Conflicts Committee's Special Approval of the Merger.  D.I. 157 at 38–39.  Because Section 7.10(b) does not apply, I do not reach Thomas's implied covenant argument.  As discovery remains ongoing under the bifurcated discovery order, and under Chancellor Bouchard's ruling, Thomas may reassert an implied covenant claim if there is a basis to do so.  D.I. 107.

[52] Compl. ¶¶ 67–68.

11

requires.[53] So GP would have to demonstrate that the Merger was either on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties, or was fair and reasonable to the Partnership. Because it was reasonably conceivable that GP could not make that showing, Count I survived GP's motion to dismiss.[54] After Chancellor Bouchard's retirement, the matter was eventually reassigned to me.[55]

On February 5, 2024, with leave, GP moved for summary judgment on Count I.[56] The motion is limited to "the applicability of a presumption of good faith, and trigger of a contractual safe harbor."[57]

## II. ANALYSIS

This Court will grant a motion for summary judgment where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.[58] In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists.[59]

---

[53] D.I. 55 at 23–24, 32.

[54] *Id.* at 32–33.

[55] D.I. 105.

[56] D.I. 141.

[57] D.I. 140.

[58] Ct. Ch. R. 56(c).

[59] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018).

"Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[60] The parties disagree on the issue of breach.

"When interpreting a contract, the court's ultimate goal is to determine the shared intent of the parties."[61] "To determine what contractual parties intended, Delaware courts start with the text."[62] "Under the objective theory of interpretation, Courts assign unambiguous contract provisions or terms their plain meaning."[63] Delaware courts read the "contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[64] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[65]

---

[60] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).

[61] *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *10 (Del. Ch. Aug. 23, 2010).

[62] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[63] *Schwan's Home Serv., Inc. v. Microwave Sci., JV, LLC*, 2013 WL 3350881, at *5 (Del. Super. Ct. June 24, 2013).

[64] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *Kuhn Constr.*, 990 A.2d at 396–97).

[65] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

### A. Section 7.10(b) Does Not Apply To Approval Or Special Approval Of The Merger.

GP seeks a summary judgment based on the application of Section 7.10(b)'s conclusive presumption of good faith, either to itself or to the Conflicts Committee. While I address the specifics of GP's arguments in the following sections, GP's arguments fail for a more fundamental reason: Section 7.10(b) does not apply to GP's approval or the Conflicts Committee's Special Approval of a conflicted transaction. This Court's holdings in *Dieckman v. Regency GP LP*[66] and *Morris v. Spectra Energy Partners (DE) GP, LP*[67] are dispositive.

In *Spectra*, this Court considered the interaction between provisions nearly identical to Sections 7.9(a) and 7.10(b).[68] Like here, the defendants argued that a conflicts committee's grant of special approval in reliance on a fairness opinion established a conclusive presumption that the general partner approved the transaction in good faith.[69] But the Court held that Section 7.10(b)'s provision offering the general partner a general conclusive presumption was inapplicable to conflicted transactions, as Section 7.9(a) dealt specifically with conflicts and granted

---

[66] 2021 WL 537325 (Del. Ch. Feb. 15, 2021).

[67] 2017 WL 2774559 (Del. Ch. June 27, 2017).

[68] *See id.* at *6–7, *11.

[69] *Id.* at *10–11.

only a rebuttable presumption.[70]  Although *Spectra* referenced the partnership agreement's subheadings in interpreting the provisions, which the LPA here prohibits,[71] *Spectra* also made clear that "'the settled rules of contract interpretation' counsel the Court to prefer Section 7.9(a), a specific provision, over the more general Section 7.10."[72]

The *Dieckman* partnership agreement also contained similar provisions, except that Section 7.9(a) did not afford the conflicts committee a presumption of good faith.[73]  There, neither of the safe harbors in clauses (i) and (ii) had been satisfied.[74]  Informed by *Spectra*, *Dieckman* also declined to apply Section 7.10(b)'s conclusive presumption of good faith in a conflicts situation.  This Court reasoned

> it would be illogical to "conclusively presume" good faith in a conflict transaction when the provision specifically dedicated to addressing

---

[70] *Id.* at *11–13.

[71] LPA § 1.2.

[72] 2017 WL 2774559, at *11 (quoting *Brinckerhoff v. Enbridge Energy Co., Inc.*, 2017 WL 1046224, at *9 (Del. Mar. 20, 2017), *as revised* (Mar. 28, 2017)); *see also Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93 (Del. 2013) (citing *Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141 at 11, 20–21, 53–55 (Del Ch. Oct. 26, 2012) (TRANSCRIPT) for the proposition that "a general conclusive presumption of good faith did not apply when a limited partnership agreement created a rebuttable presumption of good faith applicable to conflict transactions").

[73] *Dieckman*, 2021 WL 537325, at *25 n.279 ("The partnership agreement in *Spectra* expressly stated in Section 7.9(a) that '[i]f Special Approval is sought, then it shall be presumed that, in making its decision, the Conflicts Committee acted in good faith.'  This language does not appear in Section 7.9(a) of the LP Agreement, which is silent as to whether approval of a transaction by a properly constituted Conflicts Committee would be entitled to a presumption of good faith . . . ." (quoting *Spectra*, 2017 WL 2774559, at *7)).

[74] *Id.* at *24.

conflicts of interest only affords a rebuttable presumption of good faith if the General Partner determines that a transaction satisfies either the Unrelated Third Parties or Fair and Reasonable clauses. Rather, as the court in *Spectra* concluded, it would be far more logical that the provision specific to conflict transactions would govern over a general provision concerning reliance on advisors.[75]

Here, "whenever" a conflict arises, Section 7.9(a) specifically provides for a rebuttable presumption of good faith for the Conflicts Committee in the Special Approval safe harbor, or a rebuttable presumption for GP if it determines the transaction meets the standards in clauses (iii) and (iv).[76] It would be against the settled rules of contract interpretation, and Delaware precedent, to conclusively presume either the Conflicts Committee's or GP's good faith based on general reliance on advisors, when Section 7.9(a) specifically provides each only a rebuttable presumption in a conflicted transaction. As the Court concluded in *Spectra* and *Dieckman*, the provision specific to conflicted transactions governs over the general provision based on advisors.

---

[75] *Dieckman* also referenced the agreement's subheadings to aid its interpretation of the provisions at issue. *Id.* at *24, *24 n.276 ("The LP Agreement does not contain any provision prohibiting use of headings and subheadings to interpret its provisions."). But as in *Spectra*, the references to subheadings are not necessary to its holding.

[76] LPA § 7.9(a).

**B.** **GP Has Not Established The Conflicts Committee Triggered Section 7.10(b) For GP.**

Even if Section 7.10(b)'s conclusive presumption of good faith applied to conflicted transactions, GP would not be entitled to a summary judgment. Section 7.10(b) establishes four requirements to trigger the conclusive presumption: (1) GP must select an advisor; (2) GP must consult with the advisor; (3) GP must rely on the advisor's opinion; and (4) GP must reasonably believe the matter for which it sought advice was within the advisor's professional or expert competence.[77] GP did not itself satisfy these steps, and does not argue that it did.[78] Yet GP still makes two arguments seeking Section 7.10(b)'s conclusive presumption for itself, built from *Norton v. K-Sea Transportation Partners L.P.*[79] and *Bandera Pipeline Partners, LP v. Bandera Master Fund LP*.[80] Neither secures GP a summary judgment.

First, GP argues that because the Conflicts Committee relied on Evercore, so did GP, and so GP enjoys Section 7.10(b)'s conclusive presumption. GP roots this transitive reliance argument in *Norton*, which also addressed a conflicted MLP transaction where the partnership agreement afforded the general partner a general

---

[77] *City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at *21 (Del. Ch. Apr. 24, 2024).

[78] *See* D.I. 144 at 29–35 (arguing only that the Conflicts Committee satisfied Section 7.10(b)'s elements).

[79] 67 A.3d 354 (Del. 2013).

[80] 288 A.3d 1083 (Del. 2022).

conclusive presumption of good faith when acting in reliance on advisors.[81]  The MLP's general partner was controlled by its own general partner (the "*Norton* GPGP").[82]  The *Norton* GPGP's board formed a conflicts committee to obtain a fairness opinion and grant special approval of the merger.  Once that process was complete, the general partner approved the merger.[83]  *Norton* determined the general partner enjoyed the conclusive presumption even though the *Norton* GPGP's conflicts committee obtained the fairness opinion.[84]  The Delaware Supreme Court explained "it [wa]s unreasonable to infer that the entire [*Norton* GPGP] Board did not rely on the opinion that a [*Norton* GPGP] Board subcommittee obtained."[85]  The Court noted the general partner was "a 'pass-through' entity controlled by [*Norton* GPGP]," and concluded "the only reasonable inference" was that the general partner relied on the fairness opinion.[86]

GP seeks that same inference here.[87]  By its plain text, *Norton* offers one example where it was found to be reasonable to infer a general partner actually relied

---

[81] *Norton*, 67 A.3d at 356–57, 366.

[82] *Id.* at 367.

[83] *Id.* at 358–59.

[84] *Id.* at 367.

[85] *Id.*

[86] *Id.*

[87] D.I. 144 at 37.

on a conflicts committee's advisor's opinion.[88]  That is a factual determination.[89]  I do not read *Norton* as offering a legal conclusion that all general partners are deemed to have relied on conflicts committee advisors.

Here, the undisputed facts viewed favorably to the nonmovant do not support the inference that GP relied on Evercore's Fairness Opinion.  To the contrary, the undisputed facts show the Board did not see the Fairness Opinion.[90]  Evercore refused to give the Board that advice, recognizing the adversarial dynamic between its client—the Conflicts Committee—and the full Board.[91]  The March 16 Board meeting minutes indicate Evercore's presentation was to educate the Board about "the Conflicts Committee's process as it related to valuation,"[92] not to give the Board a fairness opinion.  The Board heard a summary of the Conflicts Committee's process and saw an abbreviated deck summarizing the high points of Evercore's

---

[88] *Norton*, 67 A.3d at 367.

[89] *See New Castle Cnty. v. Disabatino*, 781 A.2d 687, 690 (Del. 2001).

[90] D.I. 163 Ex. 75 (distributing a presentation deck regarding valuation, but not the Fairness Opinion or the full deck prepared for the Conflicts Committee); D.I. 157 Ex. 28 at 22 (testifying Evercore lead did not share the Fairness Opinion with the Board and did not attend a presentation of the Fairness Opinion to the Board).

[91] D.I. 157 Ex. 13 (prohibiting the Board from relying on the Fairness Opinion in the engagement letter between Evercore and the Conflicts Committee); D.I. 157 Ex. 27 at 50 (testifying the engagement letter prohibited Board reliance because Board members not on the Conflicts Committee represented GP on the opposite side of negotiations).

[92] D.I. 144 Ex. 12 at 2.

advice to the Conflicts Committee.[93] That presentation stated reliance was limited to the Conflicts Committee, as described by Evercore's engagement letter.[94] The undisputed facts preclude, rather than support, any inference that GP relied on Evercore's advice.

Second, GP presses that under *Bandera*, the Conflicts Committee was acting for GP, and so GP is entitled to receive the conclusive presumption as a matter of law. *Bandera* speaks to when another entity in the MLP structure acts for the general partner, so that entity's advisor's opinion redounds to the general partner.[95] That *Bandera* entity was not a conflicts committee meant to negotiate against the general partner.[96] In *Bandera*, an MLP's general partner had a call right that provided the option to take the partnership private.[97] The general partner's general partner ("*Bandera* GPGP") was an LLC whose sole member (the "Sole Member") had the

---

[93] D.I. 163 Ex. 75 at 918–30; D.I. 144 Ex. 12.

[94] D.I. 163 Ex. 75 at 919.

[95] *Bandera*, 288 A.3d at 1119–20.

[96] Safe harbors like special approval by a conflicts committee act as minority investor protections. *Dieckman v. Regency GP LP*, 155 A.3d 358, 360 (Del. 2017); *Conway*, 2024 WL 1752419, at *16. If a fairness opinion obtained by a conflicts committee redounded to the general partner to secure the general partner a conclusive good faith presumption, that would frustrate the protective function of special approval, as "virtually every conflicts committee with a transaction of this magnitude" hires a financial advisor. *El Paso*, C.A. No. 7141-CS, at 20.

[97] *Bandera*, 288 A.3d at 1087.

20

"exclusive authority" to cause the general partner to exercise the call right.[98]  The Sole Member exercised its authority to trigger the call right after it obtained a legal opinion as to the right's viability.[99]  The Delaware Supreme Court concluded that the opinion "redound[ed] to the benefit of the General Partner because the Sole Member Board was acting for the General Partner when it caused the call right exercise."[100]  Looking to *Norton*, the Court stated,

> The same reasoning [as in *Norton*] applies here with equal force.  The General Partner is a 'pass-through entity' controlled by the [*Bandera*] GPGP.  For purposes of the call right, the Sole Member . . . controlled the [*Bandera*] GPGP and accepted [the] opinion for the General Partner.  Thus, 'the only reasonable inference' is that if the Sole Member relied on Skadden's opinion, then so did the General Partner.[101]

But *Bandera* does not compel the conclusion that the Conflicts Committee was acting for GP.  While the *Bandera* Sole Member acted for the general partner by exercising the Sole Member's exclusive authority to execute the general partner's call right, the Conflicts Committee here had no authority to act on GP's behalf, much less to approve the Merger.  Rather, the Conflicts Committee was charged with negotiating against GP "on behalf of the Partnership," and could offer only Special

---

[98] *Id.* at 1091, 1113–14.

[99] *Id.* at 1087–88.

[100] *Id.* at 1120.

[101] *Id.*

21

Approval.[102]   And as it is not reasonable to infer GP actually relied on Evercore's Fairness Opinion, there is no basis to infer that Evercore's advice redounds to GP.

GP has not established it is reasonable to infer that GP relied on Evercore's Fairness Opinion, that Evercore's Fairness Opinion redounds to GP, or that the Conflicts Committee was acting for GP.   GP cannot rely on the Conflicts Committee's reliance on Evercore's advice to obtain a summary judgment based on Section 7.10(b)'s conclusive presumption of good faith for GP.

### C.   GP Has Not Established The Conflicts Committee Triggered Section 7.10(b) For The Conflicts Committee.

GP also seeks the conclusive presumption for the Conflicts Committee.  GP contends that because the Conflicts Committee was acting for GP, the Conflicts Committee enjoys Section 7.10(b)'s conclusive presumption that it granted Special Approval in good faith, not just Section 7.9(a)'s rebuttable presumption.[103]  Because the Conflicts Committee's good faith is the only contested element of Special Approval, GP argues Special Approval was valid as a matter of law.[104]

---

[102] D.I. 144 Ex. 18 at 4.

[103] GP also cites *Gerber v. Enter. Prods. Hldgs., LLC* and *Norton* for the proposition that by obtaining Section 7.10(b)'s conclusive presumption of good faith, the Conflicts Committee has satisfied the subjective good faith requirement for Special Approval. *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *Norton*, 67 A.3d at 362.  I do not address this argument because the Conflicts Committee is not entitled to Section 7.10(b)'s conclusive presumption.

[104] D.I. 144 at 39.

22

As GP acknowledged, Section 7.10(b)'s plain language offers the conclusive presumption only to GP, not the Conflicts Committee.[105] GP's argument relies on the flawed premise that the Conflicts Committee was acting for GP. As explained, it was not: it was negotiating against GP, and *Bandera* is inapposite. And rewriting Section 7.10(b) to afford the Conflicts Committee a conclusive presumption, instead of a rebuttable presumption, would undermine the minority's ability to challenge the special approval process.[106] GP has not established the Conflicts Committee is entitled to Section 7.10(b)'s conclusive presumption of good faith based on the Conflicts Committee's reliance on Evercore's Fairness Opinion.

## III. CONCLUSION

GP's motion for summary judgment is denied.

---

[105] *Id.* ("Although Section 7.10(b) only refers to [GP] . . . ."); *see In re K-Sea Transp. P'rs L.P. Unitholders Litig.*, 2021 WL 1142351, at *5 (Del. Ch. Apr. 4, 2012) ("By its express terms, however, Section 7.10(b) applies only to [the general partner]; no other Defendant is entitled to its conclusive presumption.").

[106] *See Haynes Fam. Tr. v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *2 (Del. 2016) (TABLE) (noting investors in alternative entities often "look[] to the contract as the exclusive source of protective rights").